**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **FRC Balance, LLC, *et al.*,** | § | **Case No. 26-90806 (CML)** |
| **Debtors.**[1] | § | **(Joint Administration Requested)**<br>**(Emergency Hearing Requested)** |

**DECLARATION OF NATHAN COOK IN**
**SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Nathan Cook, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

**Preliminary Statement**

1. I am the Chief Restructuring Officer ("**CRO**") of FRC Balance, LLC ("**True Food Kitchen**" or the "**Company**"), the principal asset-holding and administrative entity among the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), and its affiliates. I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and the motions and applications filed on the first day (collectively, the "**First Day Motions**")[2] of these chapter 11 cases (the "**Chapter 11 Cases**").

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are FRC Balance, LLC (6386); True Food Kitchen Investco, LLC (8744); True Food Kitchen Holdings, LLC (8972); True Food Kitchen Parent, LLC (9901); FRC True Food Preston, LLC (2759); True Food Hospitality, LLC (4500); True Food Beverages, LLC (9500); TFK Maryland LLC (9157); and FRC TF California, LLC (8589). The location of the Debtors' service address for purposes of these chapter 11 cases is 7135 E. Camelback Rd, Suite 230 Scottsdale, AZ 85251. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/FRCBalance.

[2] Capitalized terms that are used but not defined herein shall have the meaning given to them in the applicable First Day Motion.

2. On October 4, 2026 (the "**Petition Date**") the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). The Debtors intend to remain in possession of their properties and manage their estates pursuant to sections 1107(a) and 1108 of the Bankruptcy Code to secure and preserve assets, administer these Chapter 11 Cases, monetize the Debtors' assets, including through the sale of the Debtors' business through a § 363 sale.

3. I am authorized to submit this Declaration on behalf of each Debtor. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, information provided by the Debtors' employees and advisors, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth herein. I am above 18 years of age and competent to testify.

**Declarant Qualifications**

4. I have served as CRO of True Food Kitchen since October 2026. In my capacity as CRO, I am familiar with the Debtors' day-to-day operations, books and records, business and financial affairs and the circumstances leading to the commencement of these chapter 11 cases. I have been involved in the strategic planning and assessment of the debtors' financial conditions, whether and why to file these chapter 11 cases, and strategic alternatives considered and explored.

5. I have more than thirty years of experience assisting companies and creditors with financial operational restructurings as an advisor and in interim management roles, including as chief executive officer, chief restructuring officer, chief financial officer, and other key stakeholder roles. I currently serve as the Head of U.S. Financial Advisory for Teneo, where I represent companies nationwide on matters involving operational improvements, balance sheet

restructurings, and interim management, among other key bankruptcy and crisis management roles.

6. Prior to joining Teneo, I spent five years as a Senior Managing Director with EY-Parthenon, leading the U.S. West Restructuring and U.S. CRO practices. Prior to EY-Parthenon, I founded a boutique restructuring firm that provided interim management services to distressed private equity-backed companies. Prior to that, I spent 14 years with AlixPartners, leading the U.S. West Restructuring and U.S. Interim CFO practices. And earlier in my career, I was part of the restructuring practice at Price Waterhouse (now part of FTI Consulting) and the bankruptcy litigation practice at Peterson Consulting (now part of Navigant Consulting).

7. I have an MBA from the Anderson School at UCLA and a BBA from the University of Michigan Ross School of Business. I am also a Certified Public Accountant (inactive status).

8. In my capacity as CRO, I am responsible for strategic recommendations and assessments regarding the Company's finances, including accounting, treasury, financial planning, capital allocation, and financial reporting. I have been actively involved in the prepetition restructuring efforts, including cost-reduction initiatives, store-closure decisions, lender negotiations, and the evaluation of strategic alternatives that ultimately led to the filing of these Chapter 11 Cases.

## Company History and Business Overview

### I. History and Mission

9. True Food Kitchen was founded in Phoenix, Arizona in 2008 and operated as a health-focused restaurant chain, focused on providing healthy, minimally processed meals for an anti-inflammatory diet. The Company's mission has been to make fresh, delicious, and nutritious food made with wholesome, simple ingredients in restaurants across the United States. True Food Kitchen was conceived by wellness author Dr. Andrew Weil and Sam Fox as a restaurant concept

serving delicious, healthy food. Today, the restaurants are 100% seed oil-free, serve grass-fed beef, antibiotic-free chicken, sustainably raised salmon, and pasture-raised eggs.

10. By fall of 2026, True Food Kitchen had grown to forty-six (46) locations across the country, plus a test kitchen at its headquarters location in Arizona.

## II. Corporate and Organizational Structure

11. The Debtors in these Chapter 11 Cases are (i) FRC Balance, LLC; (ii) True Food Kitchen Investco, LLC; (iii) True Food Kitchen Holdings, LLC; (iv) True Food Kitchen Parent, LLC; (v) FRC True Food Preston, LLC; (vi) True Food Hospitality, LLC; (vii) True Food Beverages, LLC; (viii) TFK Maryland LLC; and (ix) FRC TF California, LLC. A true and accurate copy of the Debtors' and Non-Debtor Affiliates' organizational chart is attached hereto as **Exhibit A**.

12. FRC Balance, LLC ("**FRC Balance**") is an Arizona limited liability company, and is a Debtor in these Chapter 11 Cases. FRC Balance historically served as the primary operating entity that holds much of the debt obligations as well as most vendor contracts, real property leases, bank accounts, and intellectual property. In December 2017, FRC Balance absorbed more than twenty single-restaurant LLCs in a merger, including FRC Scottsdale Crossing LLC, FRC TF CC LLC, FRC True Food Houston LLC, TFK 9 West Erie LLC, TFK Bethesda LLC, TFK Boca LLC, TFK Broadway Plaza LLC, TFK Pasadena LLC, TFK UTC LLC, and others, and became the surviving entity.

13. True Food Kitchen Investco, LLC ("**Investco**") is a Debtor in these Chapter 11 Cases and is at the top of the Debtors' organization chart, as the 100% owner of True Food Kitchen Holdings, LLC. Investco is also the holder of certain debt obligations. Investco is a Delaware limited liability company.

14. True Food Kitchen Holdings, LLC ("**Holdings**") is a Debtor in these Chapter 11 Cases and is a wholly owned subsidiary of Investco. Holdings is the 100% owner of True Food Kitchen Parent, LLC and holds certain contracts and leases. Holdings is a Delaware limited liability company and serves as a guarantor (by novation) under the Multi-Draw Loan described below.

15. True Food Kitchen Parent, LLC ("**Parent**") is the wholly owned subsidiary of Holdings. Parent is the 100% owner of FRC Balance. Parent is a Delaware limited liability company and serves as a co-borrower, jointly and severally with FRC Balance, under the Fifth Amended and Restated Multi-Draw Loan described below.

16. FRC True Food Preston, LLC ("**Preston**") is a Texas limited liability company, is a wholly owned subsidiary of FRC Balance, and is the special purpose vehicle for the Dallas, Texas restaurant location. Preston was originally formed as FRC True Food NorthPark LLC in December 2010, renamed FRC True Food NP LLC in December 2010, and renamed FRC True Food Preston LLC in January 2012. Preston is a Debtor in these Chapter 11 Cases.

17. True Food Hospitality, LLC ("**Hospitality**") is a Texas limited liability company, is a wholly owned subsidiary of Preston, and is an intermediate holding company. Hospitality is a Debtor in these Chapter 11 Cases.

18. True Food Beverages, LLC ("**Beverages**") is a Texas limited liability company, a is a wholly owned subsidiary of Hospitality, and is a special purpose vehicle that is an alcohol and beverage permittee.

19. TFK Maryland is a wholly owned subsidiary of FRC Balance, the special purpose vehicle for the Annapolis, Maryland restaurant, and is a Debtor in these Chapter 11 Cases.

20. FRC TF California, LLC is a wholly owned subsidiary of FRC Balance, a special purpose vehicle for certain California restaurant locations in Pasadena, Newport Beach, Fashion Valley, and El Segundo, and a Debtor in these Chapter 11 Cases.

### III. Prepetition Capitalization

21. As of the Petition Date, the Debtors' material funded debt obligations total approximately $42.1 million, as summarized below:

a. **Fifth Amended and Restated Multi-Draw Loan**. FRC Balance and Parent are borrowers under a Fifth Amended and Restated Multi-Draw Loan in the original principal amount of approximately $17.2 million from Kingswood and MTN C203 (the "**Multi-Draw Loan**"). The Multi-Draw Loan is secured by a senior lien on substantially all assets of FRC Balance and is guaranteed by Holdings (by novation), FRC TF California, Preston, TFK Maryland, Hospitality, and Beverages. The Multi-Draw Loan matures on June 15, 2027.

b. **Merchant Cash Advance**. FRC Balance is the obligor under certain merchant cash advance agreements from Parafin Inc., Rewards Network, and InKind Cards, InKind Fund, and InKind Warehouse.

c. **Note Purchase Agreement — Investco Debt**. Investco is the borrower under a Note Purchase Agreement in the approximate principal amount of $11.3 million from HumanCo, MTN C203, and Kingswood (the "**NPA**"). The NPA was converted from unsecured to secured in August 2026 pursuant to Amendment No. 3, with a lien on all fixtures and personal property. The NPA matures on July 8, 2027.

d. **Convertible Notes**. Investco has issued unsecured convertible notes in the aggregate principal amount of approximately $5.0 million, consisting of a $2.0 million note held by MTN C203 and a $3.0 million note held by HumanCo (collectively, the "**Convertible Notes**"). The Convertible Notes are convertible into equity of Investco.

## Expansion, Financial Distress, and Prepetition Restructuring Efforts

### I. Pandemic and Operational Challenges

22. True Food Kitchen was originally part of the Sam Fox restaurant group. The concept quickly grew to twenty (20) locations across the country, including locations in California, Texas, Georgia, Pennsylvania, Florida, Illinois, Arizona, Maryland, and Colorado. In December

2017, the Company spun off from the Sam Fox restaurant group as FRC Balance, LLC, with twenty (20) locations. Following the spinoff, the chain continued to expand over the next several years to the current forty-six (46) locations across the United States. As of the Petition Date, the Debtors operate thirty-four (34) locations across the United States, having made the difficult decision to close twelve (12) restaurants concurrently with the commencement of these chapter 11 cases.

23. The Company's growth was accompanied by a number of operational challenges. The Company experienced significant management turnover, which resulted in frequent changes to expansion strategy, brand direction, and menu offerings. Under successive leadership teams, the Company invested capital outside its core market areas and in new product lines and restaurant concepts that were ultimately unsuccessful and outside of the Company's core mission and menu. These included capital investments for equipment to sell certain new product lines in restaurants which were not well aligned with the Company's health-focused brand identity.

24. Like many restaurants, the COVID-19 pandemic materially impacted the Company's profitability and coincided with a period of the Company's growth. To increase profitability at times when in-person dining was declining, the Company used certain locations as ghost kitchens and opened one off-site kitchen for delivery service only. These tests impaired staffing and the restaurant and service experience and have since been terminated to allow the Company to focus on its core customer dining experience.

25. Additionally, while many of the Restaurants are profitable and occupy highly desirable locations, several Restaurants have struggled. Some are in areas with lower-than-anticipated foot and driving traffic, while others were impacted by changing market forces and demographics that led to steady decreases in profitability over time.

## II. Prepetition Restructuring Efforts and Strategic Alternatives

26. Prior to the Petition Date, the Debtors' management team and advisors undertook extensive efforts to address the Company's financial distress, including (a) hiring a new Chief Executive Officer, Jeff Chandler, in July 2026; (b) retaining Gordon Brothers to assist with the evaluation of the Company's real estate portfolio and attempts to renegotiate leases; (c) retaining Teneo as financial advisor to evaluate the Company's business plan and liquidity profile and assess strategic alternatives; ; (d) reducing corporate headcount; (e) renegotiating vendor contracts and limiting expenses; (f) exploring assignment transactions for all or substantially all of the Company's unexpired leases; and (h) retaining only the personnel and services needed for security, asset preservation, estate administration, and the wind-down of the Debtors' estates.

27. More recently, the Debtors have engaged in discussions with numerous parties regarding the assignment of the Debtors' unexpired leases and have entered into an agreement for the assignment of certain leases. In the coming days, the Debtors plan to file a motion to approve the assignment of those leases and intend to seek Court approval of that assignment.

## III. Reasons for Chapter 11 Filing

28. The Debtors commenced these Chapter 11 Cases because (a) the Company's liquidity is insufficient to fund security, asset preservation, estate administration, and the orderly wind-down outside of a court-supervised process; (b) chapter 11 provides the breathing room necessary to secure and preserve those assets, maintain only essential personnel and services, and administer and monetize the estates during the Chapter 11 Cases; (c) the automatic stay will halt creditor collection actions and permit the orderly administration of claims and disposition of assets; and (d) the debtor-in-possession financing facility described herein will provide the liquidity necessary to fund asset preservation, case administration, and the wind-down of the Debtors' estates through closing and thereafter as necessary.

## First Day Motions

29. Contemporaneously herewith, the Debtors filed the First Day Motions. The First Day Motions seek relief narrowly tailored to secure and preserve the Debtors' assets, maintain only essential personnel and services, administer these Chapter 11 Cases efficiently, and complete an orderly wind-down of the Debtors' estates. I believe that the relief sought in each First Day Motion is necessary and appropriate, will minimize disruption to asset preservation and case administration, and is in the best interests of the Debtors' creditors and the Debtors' estates. The factual bases for the First Day Motions are described below.

### I. Taxes Motion

30. The Debtors seek authority to pay certain prepetition taxes and fees (collectively, the "**Taxes and Fees**") owed to various federal, state, and local taxing and regulatory authorities (collectively, the "**Taxing and Regulatory Authorities**"), as well as authority to pay any post-petition Taxes and Fees that become due and owing in the ordinary course.

31. In the ordinary course of business, the Debtors incurred and remitted various Taxes and Fees, operated in multiple states and local jurisdictions, and remain subject to applicable tax and regulatory requirements in connection with their retained workforce, owned and leased property, asset dispositions, case administration, and wind-down efforts. Failure to remit the Taxes and Fees may expose the Debtors and their officers and directors to personal liability and may result in the assessment of penalties and interest that would constitute additional administrative expense claims against the estates.

32. Moreover, many of the Taxes and Fees would be entitled to priority status under section 507(a)(8) of the Bankruptcy Code and would need to be paid in full in any plan of reorganization or liquidation. Nonpayment could result in audits, penalties, liens on estate property, personal liability for responsible parties, enforcement actions, and suspension or

revocation of permits or licenses that may be necessary for asset preservation and wind-down activities. I believe payment of prepetition Taxes and Fees is necessary to avoid diminution of estate value and facilitate the orderly administration and disposition of the Debtors' assets.

## II. Insurance Motion

33. The Debtors seek authority to continue, maintain, renew, and supplement their insurance programs and to pay prepetition obligations related thereto, including insurance premiums, premium-financing obligations, workers' compensation obligations, and brokerage fees. In the ordinary course of business, the Debtors maintain insurance policies (the "**Insurance Policies**") with third-party insurance carriers (the "**Insurance Carriers**"). The Insurance Policies provide coverage for, among other things, property, auto liability, commercial umbrella liability, restaurant recovery, workers' compensation, cyber liability, general liability, directors' and officers' and other management liability, fiduciary liability, and multiple layers of excess liability coverage.

34. Maintaining the Insurance Policies without interruption is required by applicable law, contractual obligations, the Office of the United States Trustee's Operating Guidelines, and sound business practice. Any lapse in coverage could expose the Debtors to uninsured losses at restaurant sites, breach lease requirements, impair worker and third-party protections, void contractual protections, and diminish the value of equipment, leasehold interests, intellectual property, and other assets. I believe the relief requested in the Insurance Motion is necessary and in the best interests of the estates.

## III. Utilities Motion

35. The Debtors seek entry of an order prohibiting utility providers from altering, refusing, or discontinuing utility services, approving the Debtors' proposed form of adequate

assurance of payment, and establishing procedures for the resolution of disputes regarding adequate assurance.

36. The Debtors receive utility services (the "**Utility Services**") from various providers (the "**Utility Providers**"), including electricity, natural gas, water, telephone and telecommunications services, waste disposal, and related services. In certain locations, utility costs are included in or paid through the Debtors' lease obligations to landlords. Continued Utility Services at selected locations and administrative facilities are essential for security systems, lighting, climate control, fire and life-safety systems, sanitation, telecommunications, records and data access, lease compliance, asset inspections, and the preservation and marketing of equipment and other assets.

37. An interruption in Utility Services at locations selected for preservation could disable alarms, access-control systems, lighting, climate control, fire and life-safety systems, telecommunications, or other safeguards; damage equipment, records, or facilities; cause lease or regulatory defaults; impede buyer diligence and asset removal; and reduce the value of assets available for sale. I believe uninterrupted service at the limited locations identified by the Debtors is necessary to prevent immediate and irreparable harm to the Debtors' estates.

## IV. PACA/PASA Motion

38. The Debtors seek authority, in their discretion, to pay certain prepetition claims held by vendors with claims arising under the Perishable Agricultural Commodities Act ("**PACA**") or the Packers and Stockyards Act ("**PASA**") (collectively, the "**PACA/PASA Claimants**").

39. In the ordinary course of business, the Debtors purchased produce, proteins, dairy, packaging materials, and other goods, and certain resulting claims may be protected by PACA or PASA statutory trust provisions. Payment of valid PACA/PASA Claims may be necessary because

applicable trust assets may not be property of the estates. Addressing these claims in a controlled manner will protect estate value and facilitate the orderly administration of the Debtors' estates.

40. I believe payment of qualifying PACA/PASA Claims is necessary to maintain the Debtors' supply chain for their remaining restaurant operations, prevent disruption to the Debtors' business, and preserve value for the Debtors' estates.

**V. Employee Wages Motion**

41. The Debtors seek authority to pay prepetition wages, salaries, and other compensation and to continue employee benefits programs for the limited personnel retained to perform security, preservation, administration, and wind-down functions. As a service-based business, the Debtors' employees are the heart of the Company. They drive goodwill, foster customer relationships, build brand loyalty, and are the very means by which the Debtors are able to operate the Restaurants. Without the continued dedication and expertise of these individuals, the Debtors would be unable to maintain the quality of service and dining experience that defines the True Food Kitchen brand and sustains the value of the Debtors' business.

42. The Debtors' retained employees are essential to securing and preserving the Debtors' assets, maintaining necessary systems and records, administering these Chapter 11 Cases, supporting buyer diligence and asset transfers, and completing the orderly wind-down of the Debtors' estates. Failure to honor prepetition compensation obligations would harm employee morale, trigger departures, impair security and preservation efforts, delay case administration, and diminish estate value.

**VI. Cash Management Motion**

43. The Debtors seek authority to continue using their existing cash management system (the "**Cash Management System**"), to maintain their existing bank accounts, to continue using existing business forms, to implement necessary changes in the course of administering the

estates, to honor and pay all prepetition and post-petition bank fees, and to obtain an extension of time to comply with section 345(b) of the Bankruptcy Code.

44. The Debtors utilize an integrated Cash Management System to collect and reconcile cash, receivables, refunds, rebates, deposits, insurance or tax recoveries, and other estate receipts and to transfer and disburse funds for payroll, taxes, rent, utilities, security, asset preservation, professional fees, and wind-down expenses. The Cash Management System enables cash monitoring, forecasting, and reporting and allows the Debtors to maintain centralized control over the administration of fifty-seven (57) bank accounts (the "**Bank Accounts**") maintained with Wells Fargo, N.A. (the "**Bank**").

45. In the ordinary course of business, the Cash Management System collected restaurant revenue through point-of-sale systems and card-processing channels. Post-petition, the Debtors need the existing Bank Accounts and related systems to reconcile prepetition sales and settlement activity, process residual refunds and chargebacks, collect receivables and other estate recoveries, and make authorized payments for asset preservation, case administration, and the wind-down process.

46. The Debtors also seek authority to maintain their credit card processing arrangements as necessary to complete settlement of prepetition transactions and to pay or permit netting of merchant fees, refunds, and chargebacks, regardless of whether they arose pre- or post-petition.

47. The Debtors' personnel are familiar with the Cash Management System, which supports the controlled collection, safeguarding, transfer, and disbursement of estate funds. Requiring the Debtors to establish new bank accounts, obtain new checks and business forms, or implement a new cash-management infrastructure would impose significant costs, delay receipts

and authorized payments, complicate reconciliation of prepetition transactions, and impair the Debtors' ability to preserve assets, administer the estates, and complete the wind-down process. I believe the relief requested in the Cash Management Motion is necessary to preserve the value of the Debtors' estates.

## VII. Critical Vendors Motion

48. The Debtors seek authority, in their discretion, to pay prepetition claims held by certain vendors whose goods and services are critical to the continued operation of the Debtors' restaurants (the "Critical Vendors"). The Critical Vendors fall into three categories: (a) non-PACA/PASA food vendors that supply essential ingredients and food products not subject to the statutory trust protections of PACA or PASA but without which the Restaurants cannot operate; (b) janitorial service providers and dishwasher equipment rental companies that are necessary to maintain sanitation, health code compliance, and day-to-day restaurant operations; and (c) technology vendors that operate and maintain critical operating systems, including point-of-sale, inventory management, cybersecurity, and other platforms essential to the Debtors' ability to process transactions, manage operations, and serve customers. I believe payment of the Critical Vendor Claims is necessary to prevent disruption to the Debtors' restaurant operations and preserve the value of the Debtors' estates.

## VIII. Customer Programs Motion

49. The Debtors seek authority to continue, maintain, and administer their customer programs in the ordinary course of business, including (a) honoring outstanding prepaid gift cards; (b) continuing promotional programs, coupons, discounts, and refunds; (c) maintaining rewards programs and corporate partnerships; and (d) maintaining contractual arrangements with third-party delivery platforms, including DoorDash, EZCater, Forkable, Foodja, OLO, and Uber Eats. I

believe the continuation of these Customer Programs is essential to maintaining the Debtors' customer base, goodwill, and revenue, and is in the best interests of the Debtors' estates.

## IX. Joint Administration Motion

50. The Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. The Debtors are all affiliates of one another, and joint administration will avoid the unnecessary expense and burden of maintaining separate dockets, filing duplicative pleadings, and entering duplicative orders. Joint administration will not affect the substantive rights of any party or constitute a substantive consolidation of the Debtors' estates.

## X. Creditor Matrix Motion

51. The Debtors seek authority to file a single consolidated creditor matrix and a consolidated list of the thirty largest general unsecured creditors in lieu of separate matrices and lists for each Debtor. The Debtors also seek authority to redact certain personal identifying information and to serve notices and pleadings by email where an email address is available.

## XI. Claims and Noticing Agent Application

52. The Debtors plan to seek authority to retain Stretto, Inc. ("**Stretto**") as claims, noticing, and solicitation agent in the Chapter 11 Cases, pursuant to an engagement letter dated September 18, 2026. Stretto will, among other things, serve as the official agent for receiving and recording proofs of claim, maintain the official claims registers, provide electronic and physical interfaces for filing proofs of claim, and assist with noticing and solicitation. I believe the retention of Stretto is necessary to relieve the Clerk of the Court of the administrative burden of processing what are expected to be numerous claims in these Chapter 11 Cases and the Debtors will file a motion for their retention within fourteen-days after the Petition Date.

## Conclusion

53. For the reasons set forth herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions. I believe such relief is critical to secure and preserve the Debtors' assets, retain only essential personnel and services, administer these Chapter 11 Cases, monetize leases, equipment, intellectual property, claims, and other property, and complete an orderly wind-down in a manner that maximizes value for the Debtors' creditors and the Debtors' estates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 4, 2026

*/s/ Nathan Cook*
Nathan Cook